IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL GOZA, | ) | CASE NO. 1:10CV675 |
| | ) | |
| Petitioner, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| ROBERT WELCH, Warden, | ) | |
| | ) | |
| Respondent. | ) | REPORT AND RECOMMENDATION |

Petitioner, Michael Goza ("Goza"), challenges the constitutionality of his conviction in
the case of *State v. Goza*, Cuyahoga County Court of Common Pleas Case No. 06CR482150.
Goza, represented by counsel, filed his Petition for a Writ of Habeas Corpus (Doc. No. 1)
pursuant to 28 U.S.C. § 2254 on March 31, 2010. On September 3, 2010, Warden Robert Welch
("Respondent") filed his Answer/Return of Writ. (Doc. No. 7.) Goza filed a Traverse and a
Supplement to the Traverse on December 8, 2011, and December 9, 2011, respectively. (Doc.
Nos. 11, 12.) On October 6, 2011, oral arguments addressing the issue of trial counsel's
ineffectiveness were held. (Doc. No. 14.) Post-argument briefs were filed by the Respondent on
October 28, 2011, and by Goza on November 4, 2011. (Doc. Nos. 16, 17.) For reasons set forth
in detail below, it is recommended that Goza's Petition be denied.

**I. Summary of Facts**

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment
of a state court, factual determinations made by state courts "shall be presumed to be correct."
28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002). The state appellate
court summarized the facts underlying Goza's conviction as follows:

> {¶ 2} On June 16, 2006, appellant was indicted on eight counts. Count 1 charged
> burglary, under R.C. 2911.12; Counts 2 and 3 charged aggravated burglary, under
> R.C. 2911.11; Count 4 charged attempted rape, under R.C. 2923.02/2907.02;
> Count 5 charged rape, under R.C. 2907.02; Count 6 charged gross sexual

imposition, under R .C. 2907.05; and Counts 7 and 8 charged kidnapping, under R.C. 2905.01. The kidnapping and burglary charges carried repeat violent offender specifications based on a 1997 felonious assault conviction.

{¶ 3} A jury trial began on September 19, 2006, and on September 25, 2006, the jury found appellant guilty of all charges, except rape. Before sentencing, the court merged the charges of aggravated burglary, attempted rape and kidnapping, and gross sexual imposition and kidnapping. The court sentenced appellant to a mandatory six-year term on Count 1, to be served consecutively to a ten-year term on Counts 2 and 3. That ten-year term was to be served consecutively to another ten-year term on Counts 4 and 7, which was to be followed by another consecutive term of five years on Counts 6 and 8. Appellant received a total sentence of 31 years.

{¶ 4} The facts that lead to this appeal occurred on March 26, 2006. At 4:00 a.m., nine-year-old C.A.[FN1][1] awakened her mother and stepfather, Coral and Robert, to inform them that a man had just "tried to rape" her. C.A. told her parents that she woke up without her pants or underwear on. She saw a white man on her bed, beginning to remove his own pants. C.A. kicked him, screamed, and yelled "no." Nevertheless, the suspect continued to lean over her as C.A. fought him. Unsuccessful in raping her, he said, "Fine, I'll get out, but if you tell anyone, I'll hurt you."

      FN1. The minor victims are referred to herein by their initials in accordance with this court's established policy.

{¶ 5} Robert checked the house to make sure the attacker was gone. He found C.A.'s sister, three-year-old K.J., sleeping in the bunk bed the two girls shared. Robert also checked on his stepson, A.A., and went into the unoccupied room of his 15-year-old stepdaughter, T.A. The floor and bed in T.A.'s room were damp, her window screen was partially open, and the window was unlocked. Robert immediately called the police. C.A. and her mother went to the hospital. C.A. told the sexual assault nurse examiner, Nancy Hedberg ("nurse Hedberg"), the same information she had given her parents.

{¶ 6} While C.A. was at the hospital, police investigated the scene of the attack. Det. Charles Teel found five fingerprints on the window in T.A.'s room (the suspected point of entry), but found no prints on C.A.'s bed.

{¶ 7} Later that morning, K.J. woke up and told her father, "Daddy, don't do that to me no more. I don't like what you did. You hurt my vagina." Her parents, particularly Robert, were shocked. Coral suspected that K.J. was just confused because Robert matched the suspect's physical description. Coral told K.J. that C.A. was also hurt that night, and that it was not Robert who had hurt them. Robert called the police again. Coral and Robert took K.J. to the hospital. Nurse Kathleen Goellnitz ("nurse Goellnitz") said K.J. told her that a "bad man" had put his fingers in her underwear. K.J. told nurse Goellnitz that her vagina hurt and she had not liked it. K.J. reenacted what had happened. She stated, "I was sleeping in my bed and the bad man hurt me."

---

    [1]As the state appellate decision refers to this victim as "C.A.," the Court will also use these initials when referring to her.

{¶ 8} Nurse Goellnitz testified that she did not believe Robert was the attacker because of K.J.'s positive interaction with him, and that she would not have released K.J. to her parents if she felt that the father had harmed her. Nurse Goellnitz testified that K.J. probably thought her father harmed her because he was the only male in the house, and she did not understand that someone else had come into the house.

{¶ 9} On March 27, 2006, Lawrence Petrus ("the social worker"), a member of the Cuyahoga County Children and Family Services Sex Abuse Intake Department, interviewed C.A. and K.J. C.A. told him that she awoke to a man pulling her underwear down. She said after she began crying, the man threatened her to keep quiet. She tried to fight him off, and ultimately he left. K.J. told the social worker that "there was a bad man" in her room. The man had asked her to hold his penis, and he had put his finger against her vagina. The social worker determined that the statements that implicated Robert were untrue because there was no evidence that he abused K.J.

{¶ 10} A few days later, Robert and Coral went to visit T.A. at New Directions, the drug rehabilitation facility where she was living. After hearing what had happened to her sisters, T.A. told her parents that, one night, while sleeping in her bedroom at their house, she awoke to find a man in her room. Robert called the police to advise them of this incident.

{¶ 11} Detective James McPike of the Cleveland Police Department took T.A.'s statement. T.A. told the detective that appellant was the man who entered her room that night. She stated that she and the 33-year-old appellant were friends. Appellant had told T.A. that he was interested in a romantic relationship and began touching her inappropriately. Despite T.A.'s rejection, he continued to pursue her.

{¶ 12} While she was home visiting on March 10, 2006, T.A. awoke at 2:00 a.m. to find appellant in her bed. He told her he had come through her bedroom window on the north side of the house (different from the window C.A. and K.J.'s attacker used over two weeks later). Appellant told her he came by her window in the morning on previous occasions to see if she was awake. He began touching her legs, chest, and stomach. Although he was ordered to leave, appellant began telling T.A. that he loved her and stayed for one-half hour.

{¶ 13} Det. McPike asked the crime lab to compare appellant's fingerprints with the prints found on the point-of-entry window. After learning that the prints matched, he put together a six-man photo array, which consisted of appellant and five similar looking men, and took it to the victims' home. C.A. immediately selected appellant's photo; she also identified appellant as her attacker at trial.

{¶ 14} T.A. told Det. McPike where appellant lived, and the detective obtained a search warrant and an arrest warrant for aggravated burglary and attempted rape. On April 13, 2006, after Det. McPike was unable to serve the warrants because appellant was not home, appellant turned himself in to the police.

{¶ 15} Appellant's fiancee, Sheari Connor, testified that appellant was with her at 4:00 a.m. on March 26, 2006.

*State v. Goza*, 2007 WL 4442742 (Ohio App. 8th Dist. Dec. 20, 2007).

## II.  Procedural History

3

**A. Conviction**

On March 11, 2006, a Cuyahoga County Grand Jury charged Goza with the following:

> Count One: Burglary[2] in violation of Ohio Revised Code ("O.R.C.") § 2911.12, including a notice of prior conviction and a repeat offender specification;

> Counts Two and Three: Aggravated burglary[3] in violation of O.R.C. § 2911.11, each count including a notice of prior conviction and a repeat violent offender specification;

> Count Four: Attempted rape in violation of O.R.C. § 2923.02, 2907.02, including a sexually violent predator specification, notice of prior conviction and a repeat violent offender specification;

> Count Five: Rape in violation of O.R.C. § 2907.02, including  sexually violent predator specification, notice of prior conviction and a repeat violent offender specification;

> Count Six: Gross sexual imposition in violation of O.R.C. § 2907.05, including a sexually violent predator specification;

> Counts Seven and Eight: Kidnapping in violation of O.R.C. § 2905.01, each count including a sexual motivation specification, sexually violent predator specification, notice of prior conviction and a repeat violent offender specification;

> Count Nine: Drug trafficking in violation of O.R.C. § 2925.03; and,

> Count Ten: Possessing criminal tools in violation of O.R.C. § 2923.24.

(Doc. No. 7, Exh. 1.)

Goza filed a motion to suppress relative to the confiscation of marijuana and drug paraphernalia taken during the search of his residence.  The motion was granted on September 18, 2006.  (Doc. No. 7, Exh. 2.)  Consequently, Counts Nine and Ten were severed from the indictment.  *Id*.

On September 18, 2006, a competency hearing was held regarding the child victim, C.A., who was under the age of ten.  *Id*.  The court determined that C.A. was competent to testify at trial.  *Id*.

On September 25, 2006, a jury acquitted Goza of the rape charge, but found him guilty of the remaining counts.  (Doc. No. 7, Exh. 3.)  On October 30, 2006, the trial court sentenced Goza

---

[2]This charge relates to the date of March 11, 2006.

[3]Counts Two through Seven relate to the date of March 26, 2006.

4

to an aggregate prison term of 31 years.

**B. Direct Appeal**

On November 17, 2006, Goza, through new counsel, filed a Notice of Appeal with the

Court of Appeals for the Eighth Appellate District ("state appellate court") raising six

assignments of error:

> 1.  Appellant was deprived of his liberty without due process of law, where the evidence adduced at trial was insufficient to support his conviction for attempted rape.
>
> 2.  Appellant was deprived [of] his Sixth Amendment right to confront witnesses when the trial court allowed the State to introduce the uncross-examinable [sic] hearsay statements of a three year old.
>
> 3.  The trial court committed reversible error and violated Mr. Goza's right to a fair trial under the Sixth and Fourteenth Amendments of the Constitution when it admitted hearsay that did not fall within any exception to the well-settled rule prohibiting its admission.
>
> 4.  The trial court violated Mr. Goza's rights to due process and a fair trial under the Sixth and Fourteenth Amendments of the Constitution by failing to ascertain the competency of the three year old witness whose hearsay accusations were subsequently admitted against Mr. Goza at trial.
>
> 5.  Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when his counsel failed to challenge the nine-year old child's identification of him as her attacker or to otherwise challenge the reliability of that identification.
>
> 6.  Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution because he failed to object to the introduction of medical records which improperly bolstered the children's respective accounts of alleged sexual misconduct.

(Doc. No. 7-1, Exh. 6.)  On December 20, 2007, the state appellate court affirmed Goza's

conviction.  (Doc. No. 7-1, Exh. 8.)  Goza filed a timely motion for reconsideration, which was

denied on January 22, 2008.  (Doc. No. 7-1, Exhs. 10, 12.)

On March 7, 2008, Goza filed a Notice of Appeal with the Ohio Supreme Court raising four

propositions of law:

> 1.  When the State of Ohio fails to introduce sufficient evidence of guilt beyond a reasonable doubt it violates the [sic] it deprives the Defendant of liberty without due process of law.
>
> 2.  The State of Ohio violates a defendant's Sixth Amendment right to confront witnesses when the trial court permits the State to introduce the uncross-examinable

5

[sic] hearsay statements of a three year old.

3. The trial court violates defendant's right to a fair trial under the Sixth and Fourteenth Amendments of the Constitution by allowing the State to introduce inadmissible hearsay at trial.

4. Defendant is deprived [of] effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when his counsel fails to meaningfully challenge the reliability of the evidence presented.

(Doc. No. 7-1, Exhs. 13-14.) On June 18, 2008, the appeal was dismissed as not involving any substantial constitutional question. (Doc. No. 7-1, Exh. 15.)

**C.    Postconviction Relief**

On June 22, 2007, Goza, through counsel, filed a petition for post-conviction relief pursuant to O.R.C. § 2953.21, raising three claims:

1. The State violated its duty under *Brady v. Maryland* to disclose exculpatory information that the victim identified a different man as the perpetrator shortly after the incident occurred.

2. Trial counsel was ineffective in violation of the Sixth and Fourteenth Amendments of the United States Constitution; and Article I, Section 10, Ohio Constitution.

3. In light of the new evidence contained herein Mr. Goza's conviction is based on insufficient evidence, in violation of Fifth, Eighth and Fourteen[th] Amendments of the United States Constitution; and Article I, Section 10, Ohio Constitution.

(Doc. No. 7-1, Exh. 16.) In response, the State filed a motion for summary judgment. (Doc. No. 7-1, Exhs. 17 & 18.) On February 8, 2008, the court granted the motion citing *res judicata*. (Doc. No. 7-1, Exh. 20.)

On February 27, 2008, Goza filed a Notice of Appeal with the state appellate court raising a single assignment of error: "The trial court erred when it dismissed Michael Goza's petition for post-conviction relief on grounds that the petitioner's claims were barred by the doctrine of *res judicata*." (Doc. No. 7-1, Exhs. 21, 22.) Specifically, Goza argued that he presented evidence outside the record that (1) the State did not disclose exculpatory evidence regarding C.A.'s identification of Richard Givens as a suspect, and; (2) Goza's attorney failed to contact an eyewitness identification expert and investigate and present evidence of his medical disabilities. *Id*.

On December 11, 2008, the state appellate court found the trial court erred in dismissing the

6

ineffective assistance claim on the basis of *res judicata*, but nevertheless held that Goza failed to present new evidence setting forth sufficient facts and resulting prejudice.  (Doc. No. 7-1, Exh. 24.)

The Ohio Supreme Court denied an appeal as not involving any substantial constitutional question.  (Doc. No. 7-1, Exh. 27.)

**D.  Federal Habeas Petition**

On March 31, 2010, Goza filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

> **Ground One**.  Petitioner was deprived of his liberty without due process of law where the evidence against him failed to demonstrate that he was guilty of attempted rape.
>
> **Ground Two**.  Petitioner was deprived of his Sixth Amendment right to confront witnesses when the prosecution was permitted to introduce uncross-examinable [sic] hearsay from a three year old whose competence as a witness was never established.
>
> **Ground Three**.  Petitioner was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution where his trial attorney failed to meaningfully challenge the prosecution's case or to investigate, develop and present critical exculpatory evidence.
>
> **Ground Four**.  The State failed to disclose exculpatory information in violation of the Fourth Amendment.

(Doc. No. 1.)

## III.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

### A. Ground One - Sufficiency of the Evidence of Attempted Rape

Goza asserts in Ground one that there was insufficient evidence to convict him of attempted rape as there was no physical evidence. (Doc. No. 1-1 at 9-13.)

The critical inquiry on review of the sufficiency of evidence to support a criminal conviction is to determine whether the evidence could reasonably support a finding of guilt beyond a reasonable doubt. This inquiry does not require a court to "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S. 276, 282 (1966) (emphasis added). Instead, the relevant question is whether, after

8

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Johnson v. Louisiana*, 406 U.S. 356, 362 (1972).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution."  *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

The state appellate court concluded that there was sufficient evidence to convict Goza of attempted rape, as follows:

{¶ 18} Appellant argues that there was insufficient evidence to convict him of attempted rape of C.A. More specifically, he argues that there was no physical evidence that he was the man who attempted to rape C.A., that he intended to rape her, or that an attempted rape occurred. We disagree.

{¶ 19} In *State v. Jenks* (1991), 61 Ohio St.3d 259, the Ohio Supreme Court re-examined the standard of review to be applied by an appellate court when reviewing a claim of insufficient evidence:

{¶ 20} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)" *Id*. at paragraph two of the syllabus.

{¶ 21} More recently, in *State v. Thompkins*, 78 Ohio St .3d 380, 1997-Ohio-52, 678 N.E.2d 541, the Ohio Supreme Court stated the following with regard to "sufficiency" as opposed to "manifest weight" of the evidence:

{¶ 22} "With respect to sufficiency of the evidence, '"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. *See, also*, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 Ohio Op. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 [*387] S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560." *Id*. at 386-387.

9

{¶ 23} Finally, we note that a judgment will not be reversed upon insufficient or conflicting evidence if it is supported by competent credible evidence which goes to all the essential elements of the case. *Cohen v. Lamko* (1984), 10 Ohio St.3d 167, 462 N.E.2d 407.

{¶ 24} Where there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence. *State v. Nicely* (1988), 39 Ohio St.3d 147. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230.

{¶ 25} First, appellant argues there is insufficient evidence of the attacker's identity; however, it is clear that there was enough physical evidence of the attacker's identity. Appellant's fingerprints were found on the window in T.A.'s room. C.A. also picked appellant out of a six-man photo array and testified that appellant was her attacker.

{¶ 26} Appellant also argues that there was insufficient evidence that he intended to rape C.A. or that an attempted rape occurred. "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). Attempted rape is "conduct that, if successful, would * * * " result in rape. R.C. 2923.02(A). An attempt has been made when one purposely does an act constituting a substantial step in a course of conduct planned to complete the crime. A substantial step includes conduct "strongly corroborative of the actor's criminal purpose." *State v. Woods* (1976), 48 Ohio St.2d 127, 132, 35 N.E.2d 1052.

{¶ 27} Here, the evidence is clear that appellant took a substantial step and intended to rape C.A. In *State v. Powell* (1990), 49 Ohio St.3d 255, 261, 552 N.E.2d 191, the Ohio Supreme Court held that ordering a seven-year-old girl to remove her clothes "strongly corroborates his criminal purpose to engage in sexual conduct with her, and is thus a substantial step * * *." C.A. awoke laying on her back with her jeans and underwear pulled off. Her legs were spread apart. She saw appellant sitting between her legs on the bed. Appellant then put his hands on his pants' zipper and C.A. began pleading with him to stop. Even after C.A. kicked him, appellant continued to tower over her. Because C.A. continued to fight him off, appellant reluctantly left.

{¶ 28} In *State v. Robinson* (May 23, 1990), Hamilton App. No. C-890147, the Ohio Supreme Court found that, even though there was no semen found on the victim's body, an attempted rape had occurred. In that case, the defendant was also positioned between the victim's lower legs and did not leave until caught by a third party.

{¶ 29} Appellant specifically challenges a lack of physical evidence and argues that under *State v. Powell, supra*, a defendant cannot be convicted of attempted rape solely on evidence that he removed the victim's clothing. While there was no DNA evidence found on C.A.'s body, lack of such evidence is not evidence that the attempted rape did not occur. State v. Speed, Cuyahoga App. No. 83746, 2004-Ohio-5211. Further, there was clearly more evidence than removal of clothing in this case. First, appellant's fingerprints were found at the suspected point-of-entry. Secondly, credibility is usually a deciding factor in attempted rape convictions. *Id*. Here, C.A.'s account of her attack is extremely credible. She told the same story consistently throughout this ordeal, and she did not know appellant beforehand.

{¶ 30} After evaluating the evidence in a light most favorable to the prosecution, we hold that there was sufficient evidence to convict appellant of attempted rape.

10

Accordingly, appellant's first assignment of error is overruled.

*State v. Goza,* 2007 WL 4442742, *3 -5  (Ohio App. 8th Dist. Dec. 20, 2007).

The state appellate court's determination that the evidence was sufficient to sustain Goza's attempted rape conviction was neither an unreasonable application of law nor an unreasonable determination of the facts in light of the evidence.  Ground one is without merit.

**B. Ground Two - Confrontation Clause**

Goza asserts in his second ground for relief that his Confrontation Rights under the Sixth Amendment were violated by the admission of K.J.'s statements made to nurse Kathleen Goellnitz and to social worker Lawrence Petrus.[4]  Respondent argues that the state appellate

---

[4]Specifically, the statements K.J. made to Nurse Goellnitz (admitted without objection by defense counsel) were as follows:

> A.  I asked [K.J.], "Why are you here today," and [K.J.] answered, "Because Daddy hurt my vagina."  And I asked where is your vagina to make sure she understood that word.  Sometimes children hear words that they really truly don't understand, and she pointed to her vaginal area appropriately."
>
> Q.  All right.  What happened next?
>
> A.  And then I asked her if it hurts in that area and she said yes.  Then I asked her was the room dark or was it light.  She said it was not dark – "It was not dark.  It was not dark.  The TV was on."
>
> Q.  What did you ask her after that?
>
> A.  "Were your eyes open," and [K.J.] shook her head yes.  "Did the" --
>
> Q.  Continue on from there, I'm sorry
>
> A.  "Did the bad man put his fingers under your panties," and [K.J.] looked away and whispered yes.
>
>      * * *
>
> After a pause, [K.J.] had thought about it.  Then she laid down on the floor to try and show me, which is very typical of children, to demonstrate what had happened.  So she laid down on the hospital floor, as dirty as it was, and she – she laid down on the floor and said, "I was sleeping in my bed and the bad man hurt me," and the patient was pointing at that time to her vaginal region, and placed both of her hands over the area.

(Doc. No. 12-3, Tr. 343-346.)

The statements made to social worker Lawrence Petrus were as follows:

> Q.  Can you give me the exact quote that [K.J.] told you regarding the penis?

11

court properly applied federal constitutional law.

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This guarantee applies to both federal and state prosecutions. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Confrontation Clause bars the admission of "testimonial statements" made by persons who are not subject to cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004); *United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004). The *Crawford* Court concluded that "testimonial" statements include:

> *Ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, * * * extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*.

*Crawford* was reaffirmed by the United States Supreme Court in *Davis v. Washington* and *Hammon v. Indiana* (2006), 547 U.S. 813, 126 S.Ct. 2266, 2275, 165 L.Ed.2d 224, where the Court noted:  "Only [testimonial] statements ... cause the declarant to be a 'witness' within the meaning of the Confrontation Clause [and] [i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  *Davis*, 547 U.S. at 821.  The *Davis* Court held as follows:

---

        Mr. Frenden: Let the record reflect a continuing objection, Judge.
        The Court: So noted.
    A.  This is in quotes, "I opened my eyes and I saw the bad guy in the room.  He wanted me to hold on to his penis, nasty penis.  I'm not going to hold a nasty penis."

(Doc No. 12-5, Tr. 583.)

12

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822.  The *Davis* Court further acknowledged that the same interview may produce both testimonial and nontestimonial statements.  *Id.* at 828-829.

The Sixth Circuit has held that "[s]tatements 'made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used,' are precisely the sort of accusatory statements the Confrontation Clause was designed to address."  *United States v. Cromer*, 389 F.3d 662, 674 (6th Cir. 2004) (citations omitted).

There is, however, no precedent in this Circuit directly addressing whether statements given to a SANE nurse or social worker by a rape victim are testimonial, implicating the Confrontation Clause.  *See Dorsey v. Banks*, 749 F.Supp.2d 715, 721 (S.D. Ohio 2010).

The Ohio Supreme Court, relying on *Davis*, has addressed the issue.  In *State v. Arnold*, 126 Ohio St.3d 290, 303, 933 N.E.2d 775 (2010), both testimonial and nontestimonial statements from an interview of the child-victim were admitted at trial.  The Court held that statements made by the victim to interviewers at a child-advocacy center for medical diagnosis and treatment are nontestimonial and, therefore, admissible without offending the Confrontation Clause.  *State v. Arnold*, 126 Ohio St.3d 290, 303, 933 N.E.2d 775 (2010).  Specifically, the Court identified as nontestimonial the victim's statements "that described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee went inside her 'pee-pee,' that Arnold's pee-pee touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee,'" as statements the trial court properly admitted.  *Arnold* at 301.  The *Arnold* Court ruled that the trial court properly admitted the nontestimonial statements.  *Id.*

The *Arnold* Court also determined that other statements the victim made during the interview were made for forensic purposes, and therefore, were testimonial in nature.  *Id*. at 300.  The *Arnold* Court concluded that the following statements were erroneously admitted by the trial

13

court:  (1) the victim's assertion that defendant shut and locked the bedroom door before raping her, (2) her descriptions of where her mother and brother were while she was in the bedroom with defendant, of defendant's boxer shorts, of him removing them, and of what defendant's penis looked like, and (3) her statement that appellant removed her underwear.  *Id*.  Upon remand, the state appellate court was instructed to review the testimonial statements and determine whether their admission was harmless error.[5]

Here, the state appellate court concluded that Goza's constitutional rights under the Confrontation Clause were not violated as all the admitted statements were non-testimonial:

{¶ 34} Appellant argues that the trial court erred when it admitted hearsay statements. More specifically, he contends that the trial court erred when it introduced statements that K.J. made to the social worker and nurse Goellnitz. We disagree.

{¶ 35} As appellant correctly states, the Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to confront the witnesses against them. The Confrontation Clause provides a constitutional safeguard to ensure that a criminal defendant will not be convicted of a crime based on the charges of unseen, unknown, and unchallengeable witnesses. *Lee v. Illinois* (1986), 476 U.S. 530, 540, 106 S.Ct. 2056, 90 L.Ed.2d 514; *State v.. Gilliam* (1994), 70 Ohio St.3d 17, 19, 635 N.E.2d 1242. However, "where non-testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law * * * as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford v. Washington* (2004), 541 U.S. 36, 68, 124 S.Ct. 1354, 159 L.Ed.2d 177. Thus, *Crawford* only applies to hearsay statements that are not subject to any hearsay exceptions. *State v. Banks*, Franklin App. No. 03AP-1286, 2004-Ohio-6522.

{¶ 36} Under Evid.R. 801(C), "hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(B) defines "declarant" as a "person who makes a statement"; and a "statement," as defined in Evid.R. 801(A), is: "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion."

{¶ 37} Hearsay evidence is generally inadmissible, unless an exception is determined to be applicable. Evid.R. 803(4) provides that "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are an exception to the hearsay rule.

K.J.'s Statements to the Social Worker

---

[5]Upon remand, the state appellate court concluded that admission of the statements was harmless error as there was other overwhelming evidence.  *State v. Arnold*, 2010 WL 4681890 (Ohio App. 10th Dist., Nov. 18, 2010).

14

{¶ 38} K.J. spoke to the social worker regarding her attack. Appellant argues that the interview was conducted with Det. McPike, thus excluding it from the medical treatment exception; however, this is factually untrue. The social worker interviewed K.J. alone; Det. McPike only interviewed C.A. Appellant also argues that the social worker's interview cannot be considered "for the purpose of medical diagnosis or treatment" because K.J. had already been examined by the nurse at the hospital. The social worker's job went beyond the nurse's job. His duties included determining whether K.J. needed medical care or psychological help. As such, it is clear that the interview was for the purpose of medical diagnosis.

{¶ 39} Further, in child abuse cases, testimony is admissible from non-medical personnel under Evid.R. 803(4), as long as those statements were made in the course of physical or psychological treatment. *State v. McWhite* (June 14, 1991), 6th Dist. No. L-89-303. Also, this court has held that young rape victims' statements made to social workers are admissible under Evid .R. 803(4). *State v. Kurpik*, Cuyahoga App. No. 80468, 2002-Ohio-3260. However, the statements made to a social worker must be for diagnosis or treatment. *State v. Chappell* (Dec. 5, 1994), Cuyahoga App. No. 66501. Because K.J.'s statements to the social worker were clearly for the purposes of diagnosis and treatment, they are admissible under Evid.R. 803(4).

K.J.'s Statements to Nurse Goellnitz

{¶ 40} Appellant also challenges the admissibility of statements K.J. made to nurse Goellnitz at Fairview General Hospital. Generally, statements made by sexual abuse victims to nurses are considered non-testimonial. *In re D.L.*, Cuyahoga App. No. 84643, 2005-Ohio-2320. Patients are naturally motivated to be truthful with their [health care professionals] so that they may obtain effective treatment. *State v. McWhite* (June 14, 1991), 6th Dist. No. L-89-303. Admitting such statements usually depends on the declarant's perception while making the statements. *State v.. Jennings*, Clark App.2002-CA-78, 2003-Ohio-4429. Here, K.J. was seeing nurse Goellnitz because of her attack. She did not perceive the possibility of her statements being used in a trial. In fact, she probably does not know much about trials or the criminal justice system. She spoke to nurse Goellnitz believing that the nurse would help her after her terrible ordeal. Because K.J.'s statements to nurse Goellnitz were clearly for the purpose of diagnosis and treatment, and not made in anticipation of prosecution, they are admissible under Evid.R. 803(4).

{¶ 41} Because K.J.'s statements to the social worker and the nurse were clearly for the purpose of diagnosis and treatment, they were properly admitted under Evid.R. 803(4). Accordingly, appellant's second and third assignments of error are overruled.

*State v. Goza,* 2007 WL 4442742, *5 -6  (Ohio App. 8 Dist.. Dec. 20, 2007).

As there is no controlling federal precedent directly on point, the state appellate decision did not contradict any prior authoritative holding concerning the issue of whether K.J's statements made to the nurse and the social worker were improperly admitted.

Nevertheless, if this Court were to consider the Confrontation Clause as construed in *Crawford* and *Davis*, Goza's claim is meritless.  The Court must first determine whether K.J.'s statements to nurse Goellnitz and social worker Petrus were testimonial.  The record reveals that the primary reason for both witnesses interviewing K.J. was for medical diagnosis and treatment.

15

Nurse Goellnitz testified that she worked at Fairview General Emergency Room as a nurse, specially trained in the Sexual Nurse Assault Examiner ("SANE") program (Doc. No. 12-3 at 26) and that her job as a SANE nurse was to gather the history and physically examine the patient.  (Doc. No. 12-3 at 55.)  Mr. Petrus was employed by the sex abuse intake department of Cuyahoga County Children and Family Services.  (Doc. No. 12-5, Tr. 569.)  He testified that the department's goals during a child sex abuse case interview is to determine whether the victim: (1) is safe; (2) will need medical care; and, (3) will need counseling or psychological care.  (Doc. No. 12-5, Tr. 570.)  Detective McPike testified that he watched Mr. Petrus interview both victims, but that he primarily listened and only towards the end of the interview did he ask questions regarding the suspect's description.  (Doc. No. 7-4 at 214.)

Goza argues that *State v. Siler*, 164 Ohio App.3d 680 (Ohio App. 5th Dist. 2005) is controlling.  The *Siler* Court found that statements made by a three-year old victim to a law enforcement officer at the murder scene were testimonial and, therefore, the trial court's admission of such statements violated Siler's Sixth Amendment right to confrontation.  In the instant matter, Goza maintains that both the nurse and the social worker's interviews were conducted for law enforcement purposes as Detective James McPike was present.  (Doc. No. 11 at 17.)  However, as explained in *Davis*, a court must consider the primary purpose of the questioning.  *Davis*, 547 U.S. at 822.  Here, as discussed, the primary purpose of the interviews were for medical diagnosis and treatment.  Applying the *Davis* "primary purpose" rule, the Court finds that the state appellate court reasonably applied federal constitutional law finding K.J.'s statements to the nurse and social worker to be nontestimonial.

Goza also argues that the state court misread the transcript of the proceedings as it found that Detective McPike was not present when K.J. was interviewed by the social worker.  (Doc. No. 11 at 19, 20.)  Detective McPike did indeed testify he was present at K.J.'s interview.  (Doc. No. 7-4, Tr. 655.)  Even though the state appellate court incorrectly found the Detective was not present, it was harmless error as the conclusion that the interview was for medical diagnosis and treatment was proper.

Furthermore, a fair reading of the transcript indicates that defense counsel not only made no

16

objection to Nurse Goellnitz' testimony, but elicited additional details of K.J.'s statement, particularly regarding the accusation that her father was the guilty party.  (Doc. No. 12-3 at 354.) Defense counsel also mentioned K.J.'s accusation of her father during closing arguments.  (Doc. No. 7-5 at 821, 823, 831-833, 838-839.)  In addition, defense counsel cross-examined Social Worker Petrus as to his knowledge of K.J.'s allegations that her father had abused her the evening in question.  (Doc. No. 12-5 at 585-587.)  It should also be noted that K.J. did not identify Goza in either statement.  Defense counsel did object to the introduction of K.J.'s statements made directly to Social Worker Petrus; however, given all the above, and the fact that Goza did not meaningfully challenge that the children were abused, albeit by some other person,[6] any potential violation of the Confrontation Clause by admitting this testimony over objection would be harmless.

### C.  Ground Three - Ineffective Assistance of Counsel

Goza contends that trial counsel was deficient for (1)(a) failing to investigate and present evidence that C.A. identified another suspect in a "show up" procedure shortly after the incident; (1)(b) failing to challenge C.A.'s identification at trial; (2) failing to challenge a suggestive pretrial identification; (3) failing to call or consult an eyewitness or memory expert; (4) failing to object to the introduction of the victim's medical records; and (5) failing to investigate and present evidence of Goza's physical disabilities.  (Doc. Nos. 1-1 at 19; 11 at 22-30.)

To establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington,* 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id.*  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's

---

[6]Although Goza's counsel mentioned the possibility that the abuse never happened, his closing argument focused on the fact that someone else was more likely the perpetrator.

17

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6ᵗʰ Cir. 1992). Because the state courts adjudicated Goza's claims on the merits, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Kennedy v. Warren*, 2011 WL 1642194, *2 (6ᵗʰ Cir. May 3, 2011) (*quoting Harrington v. Richter*, ──── U.S. ────, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011)).

> The *Harrington* Court reiterated how difficult it is to surmount "*Strickland*'s high bar:" Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington*, 131 S.Ct. at 788.

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy. *Id.* at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6ᵗʰ Cir. 1990).

The *Harrington* Court further elaborated on counsel's trial strategic decisions:

> Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, *Wiggins*, 539 U.S., at 526–527, 123 S.Ct. 2527, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (*per curiam*). After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own

18

> responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry
> into the objective reasonableness of counsel's performance, not counsel's subjective
> state of mind. 466 U.S., at 688, 104 S.Ct. 2052.

*Harrington*, 131 S.Ct. at 790.

Moreover, "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that particular investigations are unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-691.  Furthermore, *Towns v. Smith* dispels any doubt that a lawyer's *Strickland* duty "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns*, 395 F.3d 251, 258 (6th Cir. 2005).

### (1) Failure to Challenge C.A.'s Suggestive Identification

Goza contends that he was denied effective assistance when trial counsel did not challenge Goza's identification by C.A. by way of a motion to suppress or at trial as being tainted.  (Doc. No. 11 at 26.)

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court defined the standard by which federal courts must test a claim that an in-court identification has been so tainted by a previous photographic identification as to require exclusion.  In *Simmons*, after rejecting arguments that a rule should be formulated to prohibit the use of photographs for identification, the Court stated:

> Instead, we hold that each case must be considered on its own facts, and that
> convictions based on eyewitness identification at trial following a pretrial
> identification by photograph will be set aside on that ground only if the photographic
> identification procedure was so impermissibly suggestive as to give rise to a very
> substantial likelihood of irreparable misidentification.

*Id*. at 384, 88 S.Ct. at 971.  The Court determined that such a claim must be evaluated in light of the totality of surrounding circumstances. *See Stovall v. Denno*, 388 U.S. 293, at 302, 87 S.Ct. 1967, at 1972, 18 L.Ed.2d 1199; *Palmer v. Peyton*, 4 Cir., 359 F.2d 199. The *Simmons* Court explained:

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.[FN2] The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.[FN3] Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.[FN4]

FN2. *See* P. Wall, Eye-Witness Identification in Criminal Cases 74—77 (1965).

FN3. *See id.*, at 82—83.

FN4. *See id.*, at 68—70.

Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall v. Denno*, 388 U.S. 293, 301—302, 87 S.Ct. 1967, 1972—1973, and with decisions of other courts on the question of identification by photograph.[FN5]

FN5. *See e.g., People v. Evans*, 39 Cal.2d 242, 246 P.2d 636.

*Simmons*, 390 U.S. at 383-384.

In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972), the Supreme Court declined to find identification procedures violative of due process.  In *Biggers*, the defendant had been identified in an impermissibly suggestive "show up" conducted many months after the crime.  (The show up consisted of two detectives walking the sole suspect past the victim and having him say, at her request, "shut up or I'll kill you.")  The victim, while standing in the doorway of her unlit kitchen, had been grabbed from behind by a knife-wielding youth and grappled to the floor.

20

There was no light in the kitchen, but the victim testified that she had been able to see her assailant's face in "light from the bedroom shining through."  She also testified that she had been able to see him as he walked her, at knife point, to the woods where she was raped – a walk of about two blocks in the moonlight.  According to a federal district judge who subsequently granted a petition for habeas corpus, the only description the victim had been able to give the police was "very general."   The Supreme Court reversing, found the description "more than ordinarily thorough," and ruled that the identification evidence was properly allowed to go to the jury.  *Biggers*, 409 U.S. at 200, 93 S.Ct. at 383.

Here the state appellate court on direct review concluded that since the identification was not impermissibly suggestive, there was no reason for defense counsel to file a motion to suppress.

{¶ 50} Appellant argues that he was denied effective assistance of counsel regarding C.A.'s identification of him as her attacker and the improper introduction of medical records. His arguments are without merit.

{¶ 51} In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) the result of the appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington* (1984), 466 U.S. 668; *State v. Brooks* (1986), 25 Ohio St.3d 144.

{¶ 52} In reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. *State v. Smith* (1985), 17 Ohio St.3d 98; *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299.

{¶ 53} The Supreme Court of Ohio, with regard to the issue of ineffective assistance of counsel, held in *State v. Bradley* (1989), 42 Ohio St.3d 136, that:

{¶ 54} "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." *State v. Lytle* (1976), 48 Ohio St.2d 391, 396-397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910.

{¶ 55} Failure to file a motion to suppress may constitute ineffective assistance of counsel if there is a solid possibility that the court would have suppressed the evidence. *State v. Pimental*, Cuyahoga App. No. 84034, 2005-Ohio-384. Courts apply a two-prong test to determine the admissibility of challenged identification testimony. First, the defendant bears the burden of demonstrating that the identification procedure

21

was unduly suggestive. To meet this burden, the defendant must show that the procedure was unduly suggestive and resulted in an unreliable identification. Unreliable means that the suggestive procedure is capable of resulting in an irreparable mistaken identity. *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247; *State v. Page*, Cuyahoga App. No. 84341, 2005-Ohio-1493.

{¶ 56} To determine if the procedure was impermissibly suggestive, the courts look at the totality of the circumstances, including the victim's opportunity to view the defendant during the offense, her degree of attention, the accuracy of descriptions given to the police, her level of certainty, and lapse of time from the event to the time of identification. *State v. Caldwell* (Sept. 27, 1984), Cuyahoga App. No. 45112. Then, even if the court finds the procedure suggestive, the identification would still be admissible if the identification itself was adequately reliable. *State v. Moody* (1978), 55 Ohio St.2d 64, 67, 377 N.E.2d 1008.

{¶ 57} Appellant argues that the identification process used with C.A. was impermissibly suggestive. This argument is without merit. The only people in the room during the identification process were C.A., her mother, her father, and Det. McPike. T.A. did not, as appellant suggests, tell C.A. appellant's name beforehand. Appellant also contends that because C.A. said she did not see her attacker's face, the identification was impermissibly suggestive. Appellant's argument is not well-supported. The photo array included appellant and five other men who resembled him. C.A. was told she did not have to choose anyone if she could not identity her attacker; however, she picked appellant within seconds. Because the identification was not impermissibly suggestive, defense counsel should not have filed a motion to suppress, and there is no claim for ineffective assistance of counsel.

*State v. Goza*, 2007 WL 4442742, *6-9 (Ohio App. 8th Dist., Dec. 20, 2007).

Goza argues that by the time Detective McPike showed C.A. the photo-array, she had been questioned repeatedly by different adults, including her parents, the SANE nurse, a doctor, and an unknown number of police officers. He maintains that this contact could have impacted the reliability of her testimony. Specifically, as to the photo-array, Goza contends that the use of simultaneous (as opposed to sequential) lineups is problematic because they encourage eyewitnesses to compare amongst the pictures to select the "best fit."[7]  (Doc. No. 11 at 27.)

As noted by the state appellate court, the identification procedure was not impermissibly

---

[7]Goza indicates that in March, 2010, the Ohio General Assembly passed a bipartisan reform bill mandating new identification procedures. Specifically, a lineup or photo array must be conducted sequentially, by a "blind" administrator (blind, meaning the person doing the array does not know who the suspect is). The law also mandates that failure to comply with its provisions must be considered by trial courts in adjudicating motions to suppress eyewitness identifications resulting from or relating to the lineup. (Doc. No. 11 at 27.)  Goza argues that because of these developments in the law, the state appellate court's decision is not reasonable.

suggestive.  The record reflects that it was conducted at C.A.'s home with her parents present.

Detective McPike showed C.A. a photo array of Goza and five others, all resembling Goza.  He

told C.A. that she did not have to choose any picture.  The record further reflects that within

seconds, C.A. picked Goza's picture out of the array.  Nothing here would lead this Court to

conclude the identification from the photo-array was suggestive.  Moreover, as the photo-array

was not suggestive, the Court also finds that C.A.'s identification of Goza at trial was not tainted.

Therefore, the state court's finding was neither contrary to nor an unreasonable application of

clearly established Federal law.

### (2) Failure to Call or Consult Eyewitness or Memory Expert

Goza next contends that trial counsel was ineffective for failing to offer expert testimony to

address fundamental reliability problems with the state's primary evidence – the eyewitness

identification.

The state appellate court concluded that counsel's failure to call an expert was not

unreasonable:

> **Failure to Use an Eyewitness or Memory Expert**
>
> {¶ 58} Appellant argues that his counsel was ineffective because he failed to consult an eyewitness or memory expert. Consulting such an expert is "well within the standard of reasonable trial tactics." *State v. Day*, Cuyahoga App. No. 79368, 2002-Ohio-669. Ordinarily, the use of trial tactics does not constitute a denial of effective assistance of counsel. *State v. Briscoe* (Nov. 22, 2000), Cuyahoga App. No. 77832. Because calling witnesses is within the realm of trial tactics, defense counsel did not have a duty to call an expert witness.
>
> {¶ 59} C.A. was a very reliable witness, whose story remained unchanged throughout the whole ordeal.[8] It was not unreasonable for trial counsel to determine that an expert was not needed. Therefore, the claim for ineffective assistance of counsel based on failure to call expert witnesses fails.

*State v. Goza*, 2007 WL 4442742, **6-9 (Ohio App. 8th Dist., Dec. 20, 2007).

The state appellate court reasonably applied *Strickland* and held that Goza had not

overcome the presumption that the challenged action might be considered sound trial strategy.

*See Strickland*, 466 U.S. at 689.  Furthermore, the Ohio Supreme Court has declined to find

---

[8]Goza's brief on direct appeal contained a footnote regarding C.A.'s identification of Givens, noting that this information was not disclosed to the defense at trial.  (Doc. No. 7-1 at 71.)

23

ineffective assistance of counsel based upon the failure to employ an eyewitness identification expert. *State v. Madrigal*, 87 Ohio St.3d 378, 721 N.E.2d 52 (2000)).  Choosing to rely upon cross-examination in order to impeach an eyewitness is certainly within the realm of trial strategy. *See Madrigal v. Bagley*, 276 F.Supp.2d 744, 791-792 (N.D. Ohio 2003).  Moreover, the Sixth Circuit has held that the failure of trial counsel to obtain an eyewitness identification expert did not amount to ineffective assistance of counsel. *See Dorch v. Smith*, 105 Fed. Appx 650, 656 (6th Cir. 2004) (such a claim is unsupported by clearly-established Supreme Court precedent).

### (3) Introduction of Medical Records

#### (a) Medical Records of C.A. and K.J.

Goza argues that counsel was also ineffective for failing to object when the State introduced the hospital medical records of C.A. and K.J.  (Doc. No. 1 at 19.)  He contends that these records not only enhanced the girls' credibility, but also contained statements of the medical personnel finding the girls' accusations to be truthful. *Id.*

The state appellate court addressed defense counsel's failure to object to the admission of these records, as follows:

> {¶ 60} Appellant also argues that his counsel was ineffective because he failed to object to the introduction of medical records.  Statements within medical records are admissible under Evid.R. 803(4).  Further, both nurses testified at trial.  Appellant was able to cross-examine them about statements made in the medical records.

*State v. Goza*, 2007 WL 4442742, *9 (Ohio App. 8th Dist., Dec. 20, 2007).

Moreover, nothing in the medical records supports Goza's identification as neither girl named him as the perpetrator.  Goza did not meaningfully challenge that the abuse occurred. Therefore, admission of the records, even if in error, had no impact upon the outcome of the trial.

#### (b) Evidence of Goza's Disability

Lastly, Goza argues that trial counsel was deficient as he failed to investigate and present medical evidence regarding Goza's physical inability to commit the crimes as charged.  (Doc. No. 11 at 30-31.)  Goza maintains that he has "permanent conditions of significant weakness of his left lower extremity requiring a lower leg brace with cane and wheelchair ambulation for

24

long distances." (Doc. No. 11 at 31; Exh. E.)  Goza further contends that this lapse in presenting

medical evidence cannot be excused as trial tactics.  *Id.*

The state postconviction appellate court held:

{¶ 22} Goza next alleged in his petition that he was entitled to a new trial because he was denied his Sixth Amendment right to effective assistance of counsel.

{¶ 23} To secure a hearing in a postconviction proceeding on a claim of ineffective assistance of counsel, the petitioner must proffer evidence demonstrating the lack of competent counsel and that the defense was prejudiced by the deficient performance. *State v. Jackson* (1980), 64 Ohio St.2d 107, 111, 413 N.E.2d 819. Generally, proffering evidence outside the record of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of res judicata. *Cole, supra* at 114, 443 N.E.2d 169.

{¶ 24} In his petition, Goza claimed that counsel was ineffective for failing to investigate and present evidence that he was physically incapable of committing the crimes for which he was convicted. Goza argued that he was severely disabled as a result of a motorcycle accident in 2003, which caused permanent nerve damage and rendered him incapable of activity beyond the most basic ambulatory functions.

{¶ 25} Goza attached to his petition inpatient records relating to his hospitalization and surgery following the accident, medical records regarding subsequent office visits, and his medical records from the correctional facilities. In addition, he attached a letter from Dr. Clyde L. Nash, Jr., a board certified orthopaedic surgeon with speciality training and experience relating to the spine, in which Dr. Nash opined that his review of Goza's medical records indicated that Goza "would be incapable of committing acts that would require anything more than the most simple of ambulatory functions consistent with his permanent leg paralysis."

{¶ 26} On appeal, Goza argues that the trial court erred in denying this claim, because his medical records and Dr. Nash's letter indicate that he could not have climbed in and out of a first-floor bedroom window and up and down C.A. and K.J.'s bunk bed, as the prosecution theorized, to commit the crimes. Therefore, he contends, counsel was ineffective for failing to investigate and present evidence of his medical condition to the jury.

{¶ 27} Because Goza's medical records and Dr. Nash's letter are evidence outside the record, the claim could not have been raised on direct appeal, and the trial court erred in dismissing this claim on the basis of res judicata. Nevertheless, the trial court did not abuse its discretion in denying this claim, because the evidence failed to set forth sufficient facts to establish a substantial violation of counsel's duty and resulting prejudice.

{¶ 28} Dr. Nash made no analysis concerning Goza's medical history in relation to the crimes that occurred in this case. He gave no opinion regarding whether Goza could have walked across the parking lot separating his house from C.A.'s and climbed into her home through a first-floor window. Thus, Dr. Nash's letter provides no support for Goza's claim that he was too disabled to commit the crimes of which he was convicted and, therefore, fails to demonstrate that counsel was ineffective for not presenting evidence of Goza's alleged disability to the jury.[FN3]

FN3. T.A.'s testimony that she woke to find Goza in her bed

25

> only two weeks before the attempted rape of her sisters, and Goza's admission to her that he had come in through her bedroom window, are some evidence that Goza was indeed capable of sneaking into the house through an open window.

*State v. Goza,* 2008 WL 5182818, *3-5  (Ohio App. 8th  Dist., Dec. 11, 2008).

The state appellate court properly addressed the new evidence regarding Goza's medical records, concluding that it failed to demonstrate that counsel was ineffective for not presenting evidence of Goza's alleged disability.

Goza further asserts that prejudice is demonstrated as the fact finder would have had a reasonable doubt about his guilt.  (Doc. No. 11 at 30.)  Even assuming that trial counsel's performance was unreasonable under the first prong of *Strickland*, Goza has nevertheless failed to establish that he was prejudiced thereby.  Moreover, there is a presumption that challenged conduct of a petitioner's counsel is a matter of strategy.  *Strickland*, 466 U.S. at 689.  Mere disagreements by a petitioner of such strategy is not enough to support a claim of ineffective assistance.  *Id*.  The state appellate court's determination was a reasonable analysis of this issue, to include noting T.A.'s testimony that Goza had climbed through her bedroom window two weeks earlier.  Goza's fingerprint on the window when combined with T.A.'s testimony, from a strategic standpoint, would have made the disability defense incredible, rather than the decision not to present it ineffective.

### (c) Investigation of Potential Witnesses

Goza, relying on *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007), further argues that trial counsel should have offered additional witnesses in order to corroborate his alibi.  (Doc. No. 11 at 25.)

*Ramonez* involves the alleged ineffectiveness of trial counsel for failing to investigate potential defense witnesses.  The Sixth Circuit analyzed the prejudice component by considering how the three potential witnesses would have testified.  The *Ramonez* Court concluded that weighing the prosecution's case against the proposed witness testimony was at the heart of the ultimate question of the *Strickland* prejudice prong, and thus it was a mixed question of law and fact not within the § 2254(e)(1) presumption.  Even though the jury could have discredited the

26

potential witnesses based on factors such as bias and inconsistencies in their respective stories, there remained a reasonable probability that the jury would not have.  Ramonez was, therefore, prejudiced where potential witness' testimony may have helped corroborate his testimony and contradict that of a complaining witness, *see Workman v. Tate*, 957 F.2d 1339, 1346 (6th Cir. 1992), but where counsel's default in carrying out his constitutional obligations resulted in that testimony not being introduced at trial.  All it would have taken is for "one juror [to] have struck a different balance" between the competing stories.  *Ramonez* at 491 (*quoting Wiggins*, 529 U.S. at 537, 120 S.Ct. 1620.)

*Ramonez*, however, is distinguishable from the instant matter.  In *Ramonez*, the petitioner identified witnesses that counsel could have called and explained why their testimony was important to support his defense.  Here, Goza does not identify specific witnesses, let alone explain what testimony could have supported his alibi.  It seems unlikely that anyone could corroborate an alibi which consisted of Goza's fiance saying they were home alone.  As there was no ineffective assistance of counsel regarding the alibi witness, this argument is without merit.

### (4) Ineffectiveness for failing to Present Evidence that C.A. First Identified Someone Else as Intruder

Goza argues that the state appellate court improperly denied (without reaching the merits) his ineffective assistance claim stemming from trial counsel's failure to present evidence that C.A. initially identified another man, Richard Givens, as the intruder.  (Doc. Nos. 1-1 at 20; 11 at 22.)  Goza contends that this evidence is critical since K.J. first accused her father, demonstrating that neither child initially identified Goza as the intruder.  *Id*.  He further contends that as the state appellate postconviction court considered and rejected C.A.'s identification of Givens in the context of a *Brady* claim, it did not determine whether Goza was prejudiced under *Strickland*.  Goza asserts that because this issue was not decided by the state court, the habeas court must now consider the issue *de novo*.  (Doc. No. 11 at 23.)  In the Traverse, Goza conceded the *Brady* issue acknowledging that trial counsel had been provided information about C.A's identification of Givens, but either failed to review the information or forgot that it existed.

27

(Doc. No. 11 at 24.)

On October 5, 2011, oral arguments were held regarding whether Goza was denied effective assistance when trial counsel failed to present evidence that C.A. first identified Richard Givens as her attacker; and, whether, because of such error, there was a reasonable probability that the outcome of the trial would have been different.[9]

Goza raised this issue in his 26(B) application, but the state appellate court failed to address it.  Because there has been no decision by the state courts on this portion of Goza's ineffective assistance claim, this Court's review is *de novo.  See Morales v. Mitchell,* 507 F.3d 916, 929 (6th Cir. 2007); *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) ("When a state court fails to address the petitioner's federal claim, we review the claim *de novo*").

Respondent argues in his supplemental brief that Goza has not demonstrated either deficient conduct by trial counsel or that Goza was prejudiced.  (Doc. No. 15 at 4-16.) Specifically, the Warden contends that Goza has not overcome the presumption that counsel's representation was "sound trial strategy."  (Doc. No. 16 at 9.)  Respondent further contends that there is strong evidence supporting the verdict including the following: (1) the jury discounted an early and mistaken identification of the victims' father as the perpetrator by one of the victims; (2) a fingerprint established Goza's presence at the scene; (3) one of the victims testified Goza had entered the house on a prior occasion to engage in unwanted sexual conduct; and (4) one of the victims made an unequivocal identification of Goza in a photo array.  (Doc. No. 16 at 9-14.)

Goza contends that trial counsel's failure to present evidence that C.A. first identified another man was ineffective – no matter if counsel knew of the information and chose not to present it, or whether counsel simply overlooked the information – as such conduct deprived Goza of a reliable trial result.  (Doc. No. 17 at 4-5.)  Regarding Respondent's arguments demonstrating strong evidence, Goza counters that the evidence in the case was closely

---

[9]Although Goza raised this argument in his Petition, it was not addressed in Respondent's Answer/Return of Writ.

balanced.  (Doc. No. 17 at 5-6.)  Specifically, Goza argues that although his fingerprint was found on the outside of a window in T.A.'s bedroom, it could have resulted from a time he was at the house for a drug sale, as T.A. testified.   This cannot be ruled out since the age of the print could not be determined.  (Doc. No. 17 at 6.)  Goza further argues that a black and white photo array of six individuals shown to C.A. from which he was identified was not reliable.  (Doc. No. 17 at 6-7.)  He notes that because of the unreliability of photo arrays, the Ohio General Assembly enacted legislation in March, 2010, mandating new standards for identification procedures.[10]  (Doc. No. 17 at 7.)  Lastly, Goza argues that T.A.'s testimony did not prove that he molested her little sisters on March 26.  (Doc. No. 17 at 6.)

Looking at the record as a whole, the Court can only conclude that trial counsel had no idea that C.A. had initially identified Givens.  Since it is undisputed that the prosecution provided this information to counsel through the affidavit in support of the search warrant for Goza's house, this Court must further conclude that counsel was deficient in not reviewing the affidavit and/or conducting a reasonable investigation.  It is hard to imagine how such information would not fit neatly with the defense counsel otherwise mounted, *i.e.*, that Goza did not commit the offense.  This was not a strategic choice.  It was ineffective.

Although counsel was ineffective by failing to present evidence of C.A.'s identification of Givens, the Court finds no prejudice.  Upon careful review of the record, evidence is sufficiently strong that there is no reasonable probability that the result of the trial would have been different.

Regarding the fingerprint evidence, the record reflects that T.A.'s testimony included:  On March 11, 2006, she woke up and found Goza on her bed.  (Doc. No. 7-4 at 41.)  He told her he came through the window.  *Id* at 43.  She was able to observe that he came through the side window, *id*., as the screen was pushed all the way up and the window was open about 3-4 inches.

---

[10]Goza indicates new procedures are mandated, but does not specify how they are different than the procedures used in forming his photo array.  O.R.C. § 2933.83, Minimum Requirements for Live Lineup or Photo Lineup Procedures, was effective July 6, 2010.  As these provisions were not in effect when the photo array was presented to C.A., its procedures are not applicable.

*Id* at 47-48.  She further testified that she was asleep at the time Goza entered the home on March 11, and did not know how he entered the home, but if he entered through the back window (at the head of the bed), he would have stepped on her head.  *Id* at 48.  Goza told her that he had been coming by her bedroom windows for a couple of weeks at one or two in the morning to see if she was there.  *Id*. at 46.  Goza made sexual advances to her.  *Id*. at 44.  She asked him to stop and escorted him out the front door.  *Id*. at 45-46.  She returned to her bedroom and shut and locked the windows.  *Id*. at 49.  She did not mention the incident to anyone because she was in drug rehabilitation and was not allowed to talk to or see anyone, except family members.  *Id.*

The father, Robert,[11] testified that after learning about the attempted sexual assault on C.A. on March 26, he searched the house for the intruder.  (Doc. No. 7-3 at 15-19.)  In T.A.'s bedroom, he found the back window, located at the head of T.A.'s bed, closed and unlocked, but the screen was completely open.  He found the side window in T.A.'s room unlocked, but the screen was open about a quarter of the way.  *Id*. at 18.  Robert also testified that he felt dampness at the head of the bed and in some areas of the carpeting.  *Id*.  From these facts, the jury could surmise that while Goza entered the home through the side window on March 11, his fingerprint on the back window and the dampness in that area supports Goza entering the house through that window on March 26.

Regarding K.J.'s initial accusation of Robert attacking her, C.A. testified that Robert was not the perpetrator.  The record reflects C.A. to be a very intelligent and credible nine-year old. When C.A. was asked about Robert possibly being a suspect, she clearly indicated that it was not him.  *Id*. at 414.  Also, C.A. indicated that the suspect smelled like cigarettes, and there was evidence that Robert did not smoke.  *Id*. at 420.

Regarding the photo array shown to C.A. in which she identified Goza, the Court notes that the array contained six pictures of similarly-looking white, short-haired men, just as C.A.

---

[11]Robert was T.A. and C.A.'s step-father, but K.J.'s father.  Furthermore, in order to protect the minor victims, the father's last name is not used.

described.  The jury was presented with this photo array.  (Doc. No. 7-4 at 5, Exh. 110.; Doc. No. 17-1.)

T.A. also provided the jury with other evidence about Goza that supports the verdict.  She testified that he walked with a limp, but he did not seem to have difficulty moving around (Doc. No. 7-4 at 52), and he lived within a two-minute walking distance of her house.  *Id*. at 41-43.

Considering the totality of the facts presented to the jury, the Court concludes that Goza has not demonstrated a reasonable probability that the outcome of the trial would have been different.

Lastly, Goza argues that the Court should consider the effect of trial counsel's error in failing to present evidence that C.J. first identified someone other than Goza, in light of trial counsel's other alleged lapses.  (Doc. No. 17 at 11.)  The Court, however, has found that failing to expose C.A.'s initial identification of Givens was the only constitutionally ineffective conduct.  *See Mackey v. Russell*, 148 Fed. Appx 355, 365 (6th Cir. 2005) ("[T]he *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel.")

In summary, with respect to subclaims (1), (2), and (3), this Court concludes that Goza failed to establish that the decision of the state appellate court is contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d),(e).  Regarding subclaim (4), although trial counsel was ineffective in failing to present evidence of C.A.'s identification of Givens, Goza has not demonstrated a reasonable probability that, had the jury been so informed, the outcome of the trial would have been different.

### D.  Ground Four - *Brady* Violation

As Goza conceded that trial counsel was provided the information about C.A.'s identification of Givens, there was no *Brady* violation.  (Doc. No. 11 at 24.)  *See supra*, p. 27.

### V.  Conclusion

For the foregoing reasons, it is recommended that Goza's Petition be denied.

s/ Greg White_____
United States Magistrate Judge

Date:    December 1, 2011

## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

32